## PROSECUTION FOR EMBEZZLING BONDS.

Circuit Court of Cuyahoga County.

HARRY E. HAYES v. THE STATE OF OHIO.*

Decided, February 7, 1910.

*Criminal Law—Embezzlement of Bonds by Brokers Held to Have Been Complete—Premature Pledging of Bonds for Loans and Conversion of the Proceeds—Misconduct of Court and Prosecutor—Evidence— Agreements—Agency—Partnership.*

1. Where an agreement between a railway company and brokers handling the bonds of the company provides that the right of the brokers to retain the bonds should accrue contemporaneously with actual payment therefor, an indictment for embezzlement lies for the pledging of the bonds by the brokers for loans and the conversion of the proceeds of the loans by the brokers prior to a call for funds by the company.

2. Evidence is competent in such a case which tends to show that the pledging of the bonds and use of the proceeds therefrom by the brokers was not due to an honest misunderstanding by the brokers of their rights in the matter.

3. Misconduct by the court or prosecuting attorney is of little moment to an accused person against whom evidence has been presented which establishes his guilt completely.

4. An agreement to make mutual contributions to the subject-matter of an enterprise and to share the profits can not be taken as establishing a partnership, where there is nothing else in the agreement which is at all characteristic of a partnership.

*Dawley & Sullivan* and *A. A. Stearns,* for plaintiff in error.
*John A. Cline,* Prosecuting Attorney and *Walter D. Meals,* Assistant Prosecuting Attorney, contra.

HENRY, J.; MARVIN, J., and WINCH, J., concur.

The plaintiff in error was indicted jointly with his partner in the firm of W. J. Hayes & Son, for embezzling on August 7, 1907, 198 one-thousand-dollar bonds of the Cincinnati, Bluffton & Chicago Railway. Upon separate trial he was found

* Affirmed without opinion, *Hayes v. State of Ohio,* 83 Ohio State, 490.

"guilty of embezzlement, as charged in the first count of the indictment," of property valued by the jury' at $18,000, and was sentenced to five years' imprisonment.

The transaction evidently contemplated by the verdict is the pledging by the defendant below to the Pearl Street Bank, in Cleveland, on January 25, 1907, of twenty of said bonds to secure their note for $15,000. Their rights at that time with respect to these bonds are defined by the following contract:

"THIS AGREEMENT, made and entered into this 22d day of December, A. D. 1906, by and between S. H. Bracey, of Chicago, Illinois, party of the first part, and W. J. Hayes & Sons, of Cleveland, Ohio, parties of the second part, WITNESSETH:

"WHEREAS, the party of the first part is the owner of 10,080 shares of the capital stock of the Cincinnati, Bluffton & Chicago Railroad Company and of 1,275 bonds of said company, and is desirous that the said W. J. Hayes & Sons shall act as his brokers in the sale of said bonds;

"Therefore, in consideration of the sum of one dollar, and other good and valuable considerations, each to the other in hand paid and received, it is mutually covenanted and agreed by and between the parties hereto as follows, that is to say:

"1st. That, subject to the conditions hereinafter expressed, the said parties of the second part shall have and are hereby given exclusive sale of the said 1,275 bonds owned by the said first party and issued by the Cincinnati, Bluffton & Chicago Railroad Company.

"2d. The said party of the first part agrees to give to the party of the second part, pro rata as sales are made, as compensation for services, the total aggregate of 35 per cent. of the total issue of the capital stock of the said railroad; it being understood, however, that none of said stock can be physically delivered until there is a sale of the 575 bonds provided to be sold in Clause 6, so that the moneys derived from such sales can be used to release such stock from present collateral liens; provided that said stock shall be contracted to purchasers of bonds, or if retained by the second party, shall be retained with the understanding that said 10,080 shares of stock are pooled and that no stock shall be transferred unless all is sold and that each share shall participate equally and impartially in the proceeds of any sale thereof.

"3d. It is mutually covenanted and agreed that the 666 bonds of the said railroad now in the hands of Louis D. Daven-

port, of Bluffton, Indiana, as well as 34 of the bonds now in the control of the Reorganization Committee of said Railroad, making a total of 700 bonds, shall be sold and the proceeds thereof shall be devoted entirely to the cost of engineering, right-of-way for and construction of extensions of said railroad, as hereinafter described, including the securing of necessary and adequate equipment therefor. Said second parties shall have the right to sell the first 350 of said bonds at 75 per cent. of their face value, and the next 350 of said bonds at 80 per cent. of their face value, and all amounts received by said second party over and above said 75 per cent. for said first 350 bonds and 80 per cent. for said second 350 bonds shall be retained by said second parties as their compensation and commission for the sale thereof. The amount realized from the said sales of the said 700 bonds shall, from time to time, and as fast as sold, be placed on deposit with some responsible bank to the credit of the said railroad, to be drawn out and expended only for the purposes herein provided, upon checks signed by said railroad company and upon vouchers which shall be approved as being for such purposes by some responsible certified public accountant.

"4th. The party of the first part agrees to supervise the expenditure of the sums of money above provided, and to furnish necessary tools and construction equipment for the construction of said railroad, and shall receive for his compensation 10 per cent. of the actual cost of labor and materials used in the construction and equipment of said extension. It is agreed that the said extension shall be built from a point of connection with the present terminal of the said railroad in Bluffton, Indiana, to Huntington, Indiana, and form the present terminal of said railroad in Portland, Indiana, to Union City, Indiana; the construction to be in accordance with the present general standard of the construction of that portion of the railroad now in operation between Portland and Bluffton, Indiana, in relation to weight of rails, ties, grade, curves, roadbed and ballast; said entire railroad from Union City to Huntington, Indiana, to be built and placed in operation by August 1st, 1907, provided said second parties shall meet and pay all of the calls provided for in this contract in clause 7.

"5th. It is further mutually agreed that in case there shall be any profit represented by the difference between the amount of said bond sales of the 700 bonds as herein provided for, plus all subsidies and municipal aid voted or to be voted in aid of said railroad and the actual cost of the construction of said

extension and equipment therefor as provided in clause 4 (including the 10 per cent. compensation to first party) shall be divided equally between the parties hereto.

"6th. It is further mutually agreed that the remaining 575 bonds owned by the said S. H. Bracey may be sold by the parties of the second part at 85 per cent. of their face value, and that the said second parties shall retain in full for their compensation and commission all that they shall receive on the sale of said bonds in excess of 85 per cent.; all moneys received from said sales of said 575 bonds shall be used to release the same from collateral liens and the balance shall be paid to the said party of the first part.

"7th. It is further mutually agreed that the said party of the first part shall have the right to call upon the parties of the second part for the payment of twenty-five thousand dollars ($25,000) on the 15th day of February, 1907, upon the delivery to the said parties of the second part of bonds at the rate of 75 per cent. of their face value to the amount of said call, and the second party agrees to make said payment on said date to be used for the purposes herein provided for and upon the delivery of said bonds as aforesaid; subject to the right of refusal exercised as hereinafter provided; like calls for $25,000 each upon like conditions can be made by said first party, and the payment of the amount thereof shall be made by said second parties on delivery of bonds at said rate on the 15th days of March and April, 1907; and the following like calls for the following amounts upon like conditions can be made by the party of the first part, and payment thereof shall be made by the parties of the second part upon delivery of bonds at the rates herein provided for the sale thereof, that is to say:

"One hundred sixty-seven thousand five hundred dollars ($167,500) on May 15th, 1907, or later if not required for construction.

"Two hundred thousand dollars ($200,000) on June 15, 1907, or later if not required for construction.

"One hundred thousand dollars ($100,000) on July 15, 1907, or later if not required for construction.

"Four hundred eighty-eight thousand seven hundred fifty dollars ($488,750) on August 15th, 1907.

"Provided, however, and this contract is upon the express condition that the parties of the second part shall have the right to refuse any call above provided for, except the first call of February 15th, 1907, in the following manner, viz.: the said party of the first part shall give to the said party of the second

part, a notice in writing, fifteen days prior to the March and April calls, and if said parties of the second part, shall neglect or refuse within five days after such notice to notify the party of the first part of their election to meet such call, then such neglect or refusal to so notify shall amount to a refusal of such call, and said party of the first part shall give to said parties of the second part at least thirty-five days notice of all other calls provided for in this contract (meaning to except the calls of February, March and April), and if said second parties shall neglect or refuse within five days after such notice to it of such calls to notify the said party of the first part of its election to meet such call, then such neglect or refusal to so notify shall amount to a refusal of such call. All notices above referred to shall be given by mail, postage prepaid, addressed to the party of the first part at the Tribune Bldg., Chicago, Illinois, and to the parties of the second part at the Chamber of Commerce Bldg., Cleveland, Ohio; in case of such refusal and notice thereof, then the parties of the second part shall not be liable to meet and pay such call so refused, and this contract shall thereupon, at the option of the party of the first part, become null and void. The said parties of the second part shall have the right, however, to retain the bonds delivered to them for the payment of all previous calls; all other bonds to be returned to said first party.

"8th. It is further mutually agreed that the said party of the first part shall have the right to purchase materials and labor for construction, to be charged up to the construction account at the same rates and prices provided herein for the sales hereof, and in case the said first party shall sell bonds at par, said sales shall be turned over to the said parties of the second part, and the difference between the price for which said second parties are given the right to sell such bonds and the par value thereof shall be divided equally between the parties hereto.

"9th. It is understood and agreed that all bonds delivered to said second parties for sale shall have all coupons prior to the year 1907 clipped off and canceled.

"10th. This contract shall not take effect or become operative unless one P. F. Earling shall fail to perform a certain contract with party of the first part which expires by its terms December 24th, 1906, or unless said P. F. Earling shall, in the meantime, cancel or release the same.

"11th. Said first party agrees to cause the bonds to be delivered to said second parties as fast as sold, and shall deposit with second party in any event not less than 400 bonds on or

before January 5, 1907, and to give a good and sufficient bond satisfactory to second parties, with a penalty of not less than $50,000 for the faithful performance hereof by the said first party, said bond for performance to be furnished second parties on or before January 1st, 1907.

"WITNESS the hands and seals of the parties, the day and year first above written.

"(Signed)    S. H. BRACEY.    (Seal.)
"(Signed)    W. J. HAYES & SON.    (Seal.)"

Of the bonds contemplated by this contract 664 were delivered to W. J. Hayes & Son in Cleveland as follows: 400 Jan. 4, 1907; 164 March 19, 1907; and 100 June 3, 1907.

Of these, Hayes & Son subsequently returned 399; sold 42, and hypothecated the residue for money borrowed by them at various banks from January to October, 1907. As before stated twenty bonds were thus hypothecated on January 25, 1907, three weeks before anything was done or due to be done under the contract of December 22, 1906. Twenty-four more were similarly hypothecated to banks in New York and Iowa on February 19 and 20, 1907; but not until $7,500 had been paid February 16, 1907, to apply on the installment then due. On March 2, 1907, Hayes & Son paid $5,000 in short time paper; and on March 13, $18,500 more in long time paper. A call for the second installment of $25,000 to be paid March 15, 1907, had been duly made, but by mutual agreement the time of payment was postponed a month. Subsequently, all but $10,000 of the paper issued by Hayes & Son to complete the payment of the first two installments of $25,000 each was paid.

On the 10th day of March, 1907, a modification of the terms of the contract of December 22d was entered into by the parties, wherein it was agreed that Hayes & Son would issue their accommodation acceptances to the amount of $200,000 to enable the railroad company to immediately supply the funds for construction purposes, and it was agreed that the 400 bonds already delivered to Hayes & Son and the 164 bonds that were to be delivered on March 19th should be pledged to Hayes & Son as collateral security for these acceptances. Later, and on June 3d, 1907, the additional 100 bonds were delivered by Dav-

enport to Hayes & Son under a receipt which recited that they were to be used in accordance with the contract of December 22d, 1906, as modified by the arrangement of March 13th, 1907.

Thereafter on the 27th day of March, 1907, a further modification of the arrangement between the parties was made, wherein Hayes & Son were authorized to pledge upon mixed loans or otherwise, in their own business, the same as if they were their own, any and all of the bonds in their possession.

It was doubtless intended that the avails of such loans should be applied to the payment of the acceptances; but such application was not properly safeguarded. Thereafter without technical criminality, the funds derived from systematic hypothecation of the bonds were diverted by Hayes & Son until they could no longer conceal the insolvency in which they had involved not only themselves, but the railroad as well.

The plaintiff in error claims that Hayes & Son gained absolute title to the 66 bonds authorized to be retained by them in connection with the calls payable February 15, and March 15, 1907, and that the 48 bonds pledged before the contract of December 22, 1906, was modified were therefore their own bonds, or at least that Hayes & Son may well be deemed to have so supposed in perfect good faith. But there are several complete answers to this contention.

First, the letter of June 11, 1908, from the defendants below, reports "that out of the bonds which were purchased from you and which were paid for, the following have been sold," listing 42 bonds with names of purchasers.

There is no pretense that Hayes & Son ever purchased more than 66 bonds, and none of the 42 bonds so sold by them can be identified with the 48 bonds pledged in January and February, 1907. Ninety bonds were thus treated by them as their own, which is twenty-four in excess of the most they can claim to have owned. Moreover, as already pointed out, 20 bonds were hypothecated by them three weeks before they had any right to retain the same, and before they had any conclusive knowledge that they would be called upon to make the February 15th payment. Retail sales of bonds or construction de-

lays, or other contingencies might meanwhile make such call un-necessary; or they themselves might not be, as in fact they were not ready to respond promptly to their absolute liability to meet such call if made.    It is not as if they had pledged the bonds at the time and for the purpose of applying the avails in pay-ment of the call.    For it is plainly provided by the contract that their right to retain the bonds should accrue contemporane-ously with actual payment and not before.    And their entire subsequent course of conduct and concealment conclusively shows that they themselves never put any other construction upon the contract.

Right here, also, it may be said, that the evidence of trans-actions after the modification of the contract, was properly ad-mitted for this very purpose of showing that the defendants had erred under no honest misconstruction of their rights in converting the bonds to their own use.    The court properly in-structed the jury that they could find no embezzlement after February, 1907; and if further instruction were required as to the use which the jury were to make of the evidence of sub-sequent transactions, the court's attention should have been seasonably called to the omission.

The evidence of the unlawful conversion by the plaintiff in error of twenty bonds on January 25, 1907, is perfect and com-plete.    It consists essentially of documents whose authenticity is conclusive in view of the papers produced by the plaintiff in error himself and introduced by him in connection with the cross-examination of the state's witnesses.

Unless, therefore, some other elements of the crime of embez-zlement as charged in the indictment remain unproved, the alleged misconduct of court and prosecuting attorneys in the trial of the case becomes of little moment so far as the accused is concerned.    We do not at all approve of the persistence of the state's attorneys in demanding letters and documents of the accused across the trial table and in the presence of the jury, especially after the court had specifically, repeatedly and cor-rectly ruled against their right to do so.

True, the accused was not thereby compelled to give evidence against himself and hence his constitutional right was not in-

vaded. But his statutory right to exemption from comment upon his failure so to do would have been seriously invaded if his guilt were not incontestable and the court's cautions to the jury had not therefore sufficed to cure the errors thus complained of (*Sisson* v. *State,* decided by the Circuit Court of Lorain County, December, 1909). And the same is true of certain inflammatory appeals of the state's attorneys in their argument to the jury. The public prosecutor may appeal to the consciences of the jurors, but not to their prejudices. He may argue upon the facts as disclosed by the evidence in the case on trial, but not upon the demands of public opinion that the jury shall at all hazards convict persons accused of particular classes of crime.

There remains for consideration the contention that the contract of December 22, 1906, was an agreement of partnership between Bracey and Hayes & Son. We do not so construe it. True, it contemplates a certain sharing of profits and a mutual contribution to the subject matter of the enterprise. But these are often incident to contracts of employment or agency, such as this undoubtedly was. There is nothing else in the agreement that is at all characteristic of a partnership.

It is further claimed that Bracey was not the real party in interest, but that the railroad was at the outset his undisclosed principal and the real owner of the bonds, and that its status as such was fully revealed and acknowledged before the alleged embezzlement took place. The fact is that Bracey was the owner of the stock of the railroad and was expressly given plenary authority by the corporation to handle and dispose of the bonds for construction purposes. He testifies moreover that the bonds were his and the contract so recites. He had at least a qualified ownership, and this, as the court properly charged, is sufficient to support the allegation of the indictment that he was the owner. *State* v. *Kusnick,* 45 O. S., 535; *Stolé* v. *Tillett,* Ind. Supreme Court, November 4, 1909; *State* v. *Spaulding,* 24 Kan., 1.

Upon the remaining assignments of error it is sufficient to observe that conviction under this indictment is a bar to con-

viction of the plaintiff in error under any other indictment for the embezzlement of any of these bonds or the proceeds thereof prior to August 7, 1907. Nor was the state required to elect under this indictment which of the various transactions prior to that date it would rely upon for conviction. *Revised Statutes of Ohio,* Section 6842; *Brown* v. *State,* 18 Ohio State, 497; *Gravatt* v. *State,* 25 Ohio State, 162.

It would unnecessarily prolong this opinion to enter upon a discussion and analysis of the cases cited in support of these views. Suffice it to say that we deem these decisions to be controlling, and the judgment is affirmed.